```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF FLORIDA
                TALLAHASSEE  DIVISION
```

THE UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                    Case No. 4:06cr83-SPM

KOLAWOLE OLAOGUN,

          Defendant.

_____/

EXCERPT OF SECOND DAY OF TRIAL
**TESTIMONY OF KOLAWOLE ABAYOMI OLAOGUN**

       The above-entitled matter came on to be heard before the Honorable STEPHAN P. MICKLE, United States District Judge, in the United States Courthouse, Tallahassee, Florida, on the 17th day of January, 2006, commencing at 8:28 a.m.

APPEARANCES:

For the Government:        WINIFRED L. ACOSTA NESMITH
                          Assistant United States Attorney
                          111 North Adams Street, 4th Floor
                          Tallahassee, FL   32301

For the Defendant:        RANDOLPH P. MURRELL
                          Federal Public Defender
                          227 North Bronough Street, Suite 4200
                          Tallahassee, FL 32301-1300

**W. PAUL RAYBORN**
**United States Court Reporter**
**245 U.S. Courthouse**
**One North Palafox Street**
**Pensacola, FL 32502-5665**
**T.850.432.1808 – F.850.432.1809**
**prayborn@bellsouth.net**

* * *

MR. MURRELL:  Now, I would like to call Mr. Olaogun as a witness.

THE COURT:  Very well.

THE CLERK:  Raise your right hand.

KOLAWOLE ABAYOMI, DEFENSE WITNESS

SWORN AS FOLLOWS:

THE CLERK:  Do you solemnly swear that the testimony you are about to give in the cause now pending will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

For the record, sir, please state your name and spell your last name.

THE WITNESS:  My name is Kolawole Abayomi Olaogun.  The last name is O-L-A-O-G-U-N.

DIRECT EXAMINATION

BY MR. MURRELL:

Q.  Mr. Olaogun, you might spell your middle name, too.  Would you spell your middle name?

A.  A-B-A-Y-O-M-I.

Q.  And, Mr. Olaogun, what do you do for a living?

A.  I'm a manager for Taco Bell.

Q. Here in Tallahassee?

A. Yes, sir.

Q. And which Taco Bell is it?

A. The one on Tennessee Street or Basin Street.

Q. How long have you held that job?

A. I've been with the company for three and a half years.

Q. How long?

A. About three and a half years.

Q. And over the years, what sort of work have you done?

A. I've managed convenience stores for Inland, and for -- I have worked for Suwannee Swifty, which was also a convenience store.

Q. Are you married?

A. Yes, sir, I am.

Q. And how long have you been married?

A. I've been married to my wife about 18 years now.

Q. Eighteen years?

A. Yes.

Q. And you and your wife have children?

A. Yes.  We have five children together, and I have two previous from my previous marriage.

Q. You have five children together, you and your wife?

A.   Yes, sir.

Q.   And then you have two adult children?

A.   Yes, sir.

Q.   And that was from an earlier marriage?

A.   Yes, sir.

Q.   How old are you?

A.   The oldest one is --

Q.   No.  How old are you?

A.   Oh.  I'm 53.

Q.   And how much education do you have?

A.   Up to four years of college, but I only had one more semester to graduate before I left.

Q.   Where -- where have you gone to school?

A.   I went to Tampa Technical Institute in Tampa.

Q.   I'm sorry?  What was the first school?

A.   Tampa Technical Institute in Tampa, that's where I received my Associate of Science degree in political sciences, and I came to -- moved to  Florida A&M University to study --

Q.   And you're -- at this point you are just short of getting your degree?

A.   Yes, one semester.

Q.   When did you come to the United States?

A.   1978.

Q.   And how did you happen to come to the United

States?

A. As a student.

Q. And is English your first language?

A. No. My primary language is Yoruba, but English is --

Q. Let me back you up. What's the name of that first language?

A. Yoruba.

Q. How do you spell that?

A. Yoruba.

Q. And -- and that is -- you are from Nigeria, by the way? I ask you that.

A. Yes.

Q. And that language is spoken in Nigeria?

A. Yes, sir.

Q. All Nigerians speak that language?

A. No, sir. There are about 26 different dialects in Nigeria, but Yoruba is spoken by the western part of the country.

Q. Growing up in Nigeria, did you learn English?

A. Yes, sir, I did.

Q. When you first came to the United States, what was your immigration status?

A. Student. A student visa.

Q. Now, at some point you gained what's called

permanent residency?

A.   Yes, sir.

Q.   And roughly when was that?

A.   That was -- that was 1980 -- 82, '81 or '82.

Q.   And once you became a permanent resident, did that allow you to work?

A.   Yes, sir.

Q.   Do you remember when you first applied for citizenship?

A.   From what I gather yesterday, it was like -- I think it was 1989 or '90.

Q.   Do you remember applying?

A.   I remember applying, but I --

Q.   But as far as the dates, you sort of have to rely on what the records show?

A.   Yes, sir.

Q.   Now, that application, looking at the records, was terminated.  Do you remember why it was terminated?

A.   I -- my recollection was that I did not get the final decision on the application on time, and the papers that were requested -- I mean, that they wanted me to send back, I didn't get -- I mean, I couldn't get it in the time frame that was requested -- I mean, that they requested for it.

Q.   Did -- we talked about this earlier.  Do you think

you moved at some point?

A.   Yes, I moved at that time, and that is why I think I received -- I mean, I got the reply late from them, from the Immigration office.

Q.   The -- there are several charges against you here, and one is that you, essentially, registered to vote, and it looks like the date was November 20th, 2001. That's what the record seems to show.  Why did you register to vote?

A.   I registered to vote because -- I mean, there was a drive on the campus and I think I left with --

Q.   Now, you say campus, what campus was that?

A.   Florida A&M University campus.

Q.   Okay.  There was a drive taking place.  When you say a drive, what does that amount to?

A.   The drive is when they have a table out there and they -- they were always encouraging -- I mean, asking to put you to register to vote.  And my recollection was I was getting out of class with one of my classmates, and then we were walking past there.  It was registering to vote, and we -- it's like we were having general conversation.  And it's like, are you not gonna register?  And I was -- I'm like -- I think I said I've been here for more than five years or something, that, I mean, if you are here more than

five years, and you should be considered a citizen anyway, you need to register.  So I think I -- I mean, that's why I registered then.

Q.  Did you -- did you -- before you happened to come up to that table, had you had any plans to register to vote?

A.  No, sir.

Q.  If somebody hadn't been there asking you to vote, would you have ever signed up or registered?

A.  No, sir.

Q.  Now, you've seen that card, they showed that to the jury yesterday, and there is a box on that card, that registration card, that says are you a citizen, and you checked that box.  And again, why did you check that box?

A.  I mean, I -- I thought I was a citizen after being here for -- after five years, I mean, 20-something years.

Q.  Let me back you up.  At that point, now again that was in 2001.  You came here in 1978, so you had been here at that point?

A.  About 20 -- 23 years.

Q.  And so at least given the amount of thought you gave it, you thought you were a citizen?

A.  Yes, sir.

Q.   You know now that you weren't a citizen back then?

A.   Yes, I now know.

Q.   But at the time you thought --

A.   At the time I thought I was.

Q.   Now, according to the records that we've seen here, it shows that you voted about ten months later in a primary election, not one involving any federal officials, but in a state primary election.  Do you -- does that sound right?  Do you remember voting about ten months later?

A.   I probably did.  That's what the record shows, I mean.

Q.   And as far as you know, did you vote any sooner than that after registering?

A.   No, sir.

Q.   And when you voted in that election, did you think you were doing anything wrong?

A.   No, I didn't.  I did not.

Q.   Now, according to this same record that we've seen, it looks like about three days after you voted in that -- that primary election, you turned in a change of address form.  Does that chronology of events sound about right to you?

A.   It sounds right, I mean, but like Mr. Sancho said yesterday, I didn't -- I didn't -- I cannot recollect

going to that office to file a change of address. Probably when I went to vote and they asked me for my, I mean, address or something, they were looking and something, and they asked me of my correct address, that's probably why I filled that -- probably why I filled that out.

Q. Now, tell me this, from the time you registered, and again, that was -- that was on November 20th, 2001, and the time you voted in that first election some ten months later, do you recollect changing your address in that time period?

A. I -- I probably moved during that time period, but --

Q. And so -- and it does seem like maybe three days after the election you could have filed that change of address form?

A. That is possible.

Q. Now, here again, on that form there is a little box. It turns out it's the very same form that you filled out when you registered, but on that -- on that form there's a box. Again, it says, are you a citizen? And you've checked that box yes.

A. Yes.

Q. Here again, when you filled that out, did you realize you were not a citizen?

A.   No, sir, I did not realize.  I still thought I was a citizen, that's why I checked -- changed my address.

Q.   Now, you voted in that first election, and then it says -- oh, let's see.  The first election, again, was in September, I believe.  And then in November there was a -- a general election, and apparently there was a candidate for federal office in that election.  Here again, does that seem right?  Do you remember voting a second time?

A.   That's -- if the record shows that, I mean, I probably did.

Q.   When you voted that second time, did you think you were doing anything wrong?

A.   No, sir.

Q.   Now, looking at the sequence of events, oh, about seven months later you filled out that I-9 form at Taco Bell.  Do you remember seeing that I-9 form that they had up here on the screen?

A.   Yes, sir.

Q.   Do you -- as you sit here today, do you remember filling out that form?

A.   Yes, sir.

Q.   And that was about the time you started to work for Taco Bell, November of -- well, let's see, I believe -- I don't have a date, but it was about seven

month's after you voted, you went to work form Taco
Bell and filled out that I-9 form?

A.   I started work in April.

Q.   Okay.  April of 2003?

A.   Yes.

Q.   And, here again, you saw on the screen here you
had three choices.  One choice was to mark the box
that said you were a citizen, another choice was to
mark the box that said I'm a resident alien and here
is my alien number, and then I think there was a third
box you could have checked something to the effect I'm
an alien, but I'm -- and I'm allowed to work and the
space for another number.  And according to that
chart, you didn't check the box that said you were a
citizen, but you checked the box that said I'm a
resident alien and wrote in your alien number.  Is
that -- is that what you did?

A.   Yes, sir.

Q.   And why did you do that?

A.   Because that was the only column that asked -- I
mean, on that form they asked for a number.  Most of
the form, if -- if it did not ask for a number, I
picked it, unless that's -- unless it's a status to me
on that one, but on the one -- on that one it asked
for a number, and I thought that was required, that

number -- to put that number on there.

Q. Did it seem like that was the best answer?

A. Yes, sir.

Q. When you filled out that I-9 form, were you saying that you were not a citizen?

A. I wasn't saying that, but that was the closest answer to the -- to the question.

Q. Now, you applied for citizenship a second time in 2005, is that right?

A. That's correct, sir.

Q. And, again, we saw the form here. And if -- why did you apply for citizenship in 2005?

A. I won a trip with -- with Taco Bell, the company that I work for.

Q. Let me back you up. You say you won a trip through Taco Bell. How did you win the trip?

A. It's performance -- performance based competition for all the Taco Bells. And the stores that do better than the others will win the trip.

Q. And you were the manager, so you won the trip?

A. Yes, I was the manager there for that year.

Q. And where was this trip to?

A. It was to London, England.

Q. And you and your wife were both gonna go as part of the reward?

A. Yes, sir. My wife and I went to -- or supposed to go.

Q. Let me show you something I have marked as Defendant's Exhibit number 2.

MR. MURRELL: If I may I approach the witness, Judge?

BY MR. MURRELL:

Q. If you would, take a look at that. What is that?

A. This was the travel ticket that was sent to us to take that trip to London.

Q. And what was the date that you were supposed to go to London?

A. On the 19th of May.

Q. Do you need your glasses on to read it, or can you read it?

A. I can see it. 19th of May.

Q. May -- I'm sorry, what's the date again?

A. 19th May.

Q. 2005?

A. Yes, sir.

Q. Where -- what airport were you flying out of?

A. From Orlando airport.

Q. So did you and your wife drive down to Orlando?

A. Yes, we did. We drove to -- I mean, we went with one of -- my area coach at the time, my boss at the

time was supposed to drive me, drive us down there, so she did.

Q. And what happened there at the airport?

A. When we got to the airport, we were gonna check in, and they asked for our passports, and I gave them my passport, and my passport -- mine and my wife's passport, both passports, and the lady at the counter said, well, you -- you cannot -- you cannot go. I said why? And she said, where is your American passport? I said I don't have one. And she said, well, you have to be a citizen to have one. She said, if you don't have one, which means you are not a citizen here, you will need a visa. So -- and the vice president of -- of our company was -- also asked them. I said, what will I need to take that trip. And she -- the airline agent told -- I mean, told us, I mean, since I don't have an American passport to show that I'm -- I'm an American and that will allow me to enter Britain without a visa, I will need to go and secure a visa.

Q. So how many people were going on this trip?

A. Thirty-eight.

Q. And did the rest of them go on to London?

A. Yes, sir.

Q. And what happened to you and your wife?

A. We had to come back home. The company called the corporate office, and they sent somebody down to Orlando to get us a rent-a-car to come back home.

Q. Did you eventually go to London?

A. Yes, sir, I did.

Q. How much later was it?

A. In August of 2005.

Q. And how did you manage to go to London then?

A. I applied for a British visa.

Q. So at that point was it clear to you you were not a citizen?

A. Yes, sir.

Q. And when I say at that point, when you got left there at the airport?

A. Yes, sir.

Q. So how much later was it you went to the -- you went to apply for citizenship?

A. It was about two -- about two or three days later that I downloaded the form on the computer and --

Q. Did you mail that form in, do you take it in, or how did that happen?

A. I mailed it in.

Q. Now, on that form, here again, that was up here on the screen, on that application for citizenship that you filed in 2005, there is a box that says something

Q. to the effect, have you ever held yourself out to be a citizen, and you said no.  Why did you check that box no?

A.  I -- I didn't remember what was on the other forms that I probably might have filled, but I made -- at that point in time I knew that I was not a citizen, so.

Q.  The -- the forms that you voted -- that you filled out to vote, you filled out what, three or four years later?

A.  Yes, I think it was about four years later.

Q.  And when you filled out that application form, did you remember what you had put down on those voter registration cards?

A.  No, sir, I didn't remember.

Q.  Now, you did -- on that same application that you filed in 2005, you can see that you told them that you had voted and that you had registered.  Do you remember filling out the form that way?

A.  Yes, sir.

Q.  Even then did you realize you had done anything wrong?

A.  Well, I didn't think -- I mean, I didn't think I have done anything wrong because I was -- I mean, I was with the impression that I was a citizen when I

did.

Q. When you were -- and you went in for your interview and spoke to the woman that testified in court when you had the interview?

A. Yes, sir. She was the first person -- the first interview that I had, she was the first person that interviewed me.

Q. Did you talk to somebody else after that, too?

A. Yes, the second interview was with the officer, Paul Fri -- Frier.

Q. At some point were you asked to go get your voting records?

A. Yes, sir. Mr. Frier told me that I would need to go and get my voting records, I mean, since I claimed that I voted before, and he said -- asked me if I was sure that I voted, I said yes, I was. And he asked me how did I vote. I told him I had the card, the voter registration card. And he asked me -- I showed it to him, and then he said I have to turn it into him, so I gave it to him. And that's when he told me that I would need to go and get my record -- a record of my -- my voting record for every time that I voted.

Q. And did you go to the Leon County Courthouse and get those records?

A. Yes, sir, I did.

Q.   And mailed them in to Immigration?

A.   I mailed it in to them, yes, sir.

Q.   So when you filled out those voter registration cards on those two occasions back in 2001, 2002, did you think you were doing anything wrong?

A.   No, sir, I did not.

Q.   On those two forms you have checked that box that said you were a citizen.  At that point in time did you believe you were a citizen?

A.   Yes, sir, I did.

Q.   And then when you voted in those elections, did you think you had done anything wrong?

A.   No, sir.

          MR. MURRELL:  That's all the questions I have.

          THE COURT:  Very well.

          MR. MURRELL:  I'm sorry.  I would like to go ahead and move into evidence Defense Exhibit No. 2.  I don't know if I did that.

          THE COURT:  All right, sir.

     (Whereupon, Defense Exhibit 2 was received into evidence.)

                    CROSS-EXAMINATION

BY MS. NESMITH:

Q.   Mr. Olaogun?

A. Yes, ma'am.

Q. Excuse me. Olaogun, is that correct?

A. Olaogun.

Q. Olaogun.

A. Yes, ma'am.

Q. You came to the United States to attend college, right?

A. Yes. Yes, ma'am.

Q. And you attended college for about four years?

A. Of my junior college, yes, about two years.

Q. Two years?

A. Yes, for my junior college.

Q. How far did you go in college?

A. I -- I have one more semester to graduate. I have about 18 hours -- I mean, about 12 hours to graduate.

Q. And you are currently a manager at Taco Bell?

A. Yes, ma'am.

Q. What are some of your responsibilities at Taco Bell as a manager?

A. Part of my responsibility would be to -- I mean, run the restaurant and hire the people to do the job, and monetary sales, monetary cost and everything, cost analysis and everything.

Q. You basically run the operation?

A. Pretty much.

Q.   And you have employees that you supervise, right?

A.   Yes, I do.

Q.   And in supervising these employees, you make sure that they follow the rules of conduct assigned by Taco Bell, right?

A.   That's correct.

Q.   Meaning there are certain things that they can and cannot do?

A.   Yes, ma'am.

          MS. NESMITH:   For the record, I'm showing the witness Government's Exhibit No. 8.

BY MS. NESMITH:

Q.   Can you see this form?

A.   Yes, ma'am.

Q.   Now, you have seen this form before, haven't you?

A.   Yes, ma'am.

Q.   And that's your signature on this form, correct?

A.   That's correct.

Q.   Now, as a college educated manager, I'm sure that you read this form before you signed it, right?

A.   Yes, I did.

Q.   And this block right here where it says, I attest under penalty of perjury that I am.  You checked a lawful permanent resident, did you not?

A.   Yes, I did.

Q. And then you wrote in an alien number, correct?

A. Yes, ma'am.

Q. And you looked on your alien registration card in order to get that number?

A. Yes, ma'am.

Q. So you were carrying your green card with you?

A. Usually I don't carry it, but, I mean, if I'm gonna go do a business that requires me to have it, I mean, I carry it with me.

Q. But you are aware that you are supposed to carry it at all times?

A. Yes. Now I know that I'm supposed to carry it at all times.

Q. Excuse me?

A. Now I'm aware that I am supposed to carry it at all times.

Q. But you didn't know that when you first became a lawful permanent resident?

A. Well, it was -- I mean, I know the number. I keep the numbers. And when I need the number, when I need to use the number, that is when I get the number.

Q. But you know it's a very important number, a way of identifying yourself, right?

A. I thought -- I thought my driver's license will be what would identify me, but now I know I have to have

that number to identify myself at all times.

Q.   And when you went to -- when you went to the Immigration office on February 3rd of 2006, do you recall that?

A.   Yes, ma'am.

Q.   That's when --

A.   I don't remember the day, but I know I went to Immigration office.

Q.   Okay.  Do you recall meeting with Christine Null who testified here yesterday?  Do you recall meeting with her back in 2006?

A.   Yes, ma'am, I remember meeting with her.

Q.   Now, isn't it true, when you met with her --

MR. MURRELL:  Judge, it was actually 2005, wasn't it?

MS. NESMITH:  2006.  February 2006.

THE WITNESS:  2006.

MR. MURRELL:  Oh, I'm sorry.

BY MS. NESMITH:

Q.   When you met with her, you had your green card, right?

A.   Yes, ma'am, because on the paper that was sent to me, what they required me to bring for the interview with -- Ms. Null.

Q.   Now, this is the I-9 form that you signed for Taco

Bell?

A.   Yes, ma'am.

Q.   Did you also sign a form for your other places of employment?

A.   I probably did.  I mean, I can't remember.  I probably did.

Q.   And you probably indicated that you were a lawful permanent resident, right?

A.   I mean, I can't recall what would be on that form unless I see it, and then I can tell you what -- I mean, that was my writing, my signature or anything.

Q.   Okay.  When were you -- prior to working at Taco Bell, where were you working?

A.   I worked for Swifty Mart.

Q.   Do you recall completing an I-9 form when you worked there?

A.   I can't remember if I completed one or not.  But this was -- I mean, this has been about 18 years ago, 18 or some years ago.  I can't remember.  This was 1980 -- I worked for Suwannee Swifty from 1984 till -- I'm sorry, from 1984 till about '90 -- '99 or 2000, whenever they went out of business.

Q.   So between 1984 and 1999 you worked at Suwannee Swifty?

A.   Yes, ma'am.

Q.   Mr. Olaogun, you recall receiving this in the mail, do you not?  This is the memorandum of creation of record of lawful permanent resident, Government's Exhibit No. 1.

A.   I probably did.  I cannot remember because -- this was when?

Q.   It's dated October 5th of 1982 indicating that you have been approved for the status of lawful permanent resident?

A.   I probably did.  I mean, I'm pretty sure I did, but I can't --

Q.   And you would agree that when you received this form and the green card, that you were put on notice that you had become a lawful permanent resident, right?

A.   That would be correct.

Q.   I'm sorry?  I'm having trouble hearing you.

A.   I said that would be right.

Q.   Thank you.  Now, a copy of your -- your green card was given to Agent Reynolds back in November, November 28th of 2006, do you recall?

A.   He asked me for a copy of it -- he asked me for it, and I told him I didn't have it on me.  So we sent my daughter to get it, and my daughter gave it to him and he copied it.

Q.   And this would have been the same card that you gave to Christine Null during the interview of February 3rd, 2006, right?

A.   Yes, ma'am.

Q.   And you would agree that this card has never been confiscated from you, wouldn't you?

A.   No, it has never been.

Q.   No one has ever taken the card away from you?

A.   No one has ever taken it from me.

Q.   No one has ever taken the card away from you and told you that you can't use it, right?

A.   No, ma'am.

Q.   Isn't it true that you became a lawful permanent resident so that you could enjoy more rights than a visiting student here in the United States?

A.   I became a permanent resident to be able to work and take care of my family and my responsibilities.

Q.   And -- and you couldn't do that as a visiting student?

A.   No, ma'am.

Q.   So you wanted to gain more rights, and that's the reason that you applied, correct?

A.   That's correct.

Q.   And isn't that the same reason that you applied for U.S. citizenship?

A.   I applied for the citizenship because -- I mean, I thought -- my belief was after five years you would be a citizen, but when they told me that I could not do certain things because I'm not a citizen, when it was clear to me, that is when I applied.

Q.   Prior to applying for U.S. citizenship -- I believe your first application was in 1989.  Isn't it true that the reason that you applied was so that you could enjoy the rights that all U.S. citizens have in this country?

A.   I would think that's the reason why, yes.

Q.   I mean, you didn't do it just as something for you to do, correct?

A.   Well, I think -- I mean, it's something that I should do, something at that time, so.

Q.   And you made a conscious effort in filling out the application, right?

A.   Yes, ma'am.

Q.   The application is not a single page application, it's quite lengthy, wouldn't you agree?

A.   Yes, ma'am.

Q.   And it took time to fill out that application, right?

A.   Yes, ma'am.

Q.   And you -- you knew this when you completed the

application, right?

A.   That I -- that the application was lengthy?

Q.   Yes.

A.   Well, when I received the application, yes, I know -- I know how lengthy the application was when I received the application.

Q.   But you were willing to do that because you wanted to enjoy the rights of a U.S. citizen, correct?

A.   That's correct.

Q.   And one of those rights include the right to vote, isn't that so?

A.   I mean, I did not know what rights are comprised on that -- on that, other than this privilege.  I mean, I'm getting part of the reasons why -- part of the right that is -- that is under that of that privilege.  I'm just understanding part of the rights that is on that privilege now.

Q.   Okay.  Let me make sure that I understand you clearly.  What you are saying is you didn't have a clear idea of what rights you would gain as a U.S. citizen?

A.   No, ma'am.  The only right -- the only thing I know is, I mean, I will -- I -- I thought -- I thought I would be able to do this, what I'm doing when I'm applying for that.

Q. So for no specific reason you decided to apply for U.S. citizenship after you had already become a lawful permanent resident and you could work here legally in the country?

A. That's right. Yes, ma'am.

Q. And that's what you would have this jury to believe?

A. That I applied for the same reason that I have my permanent residency. I mean, I thought my permanent residency is pretty much the same thing I have, that -- so what I'm thinking is, I mean, once I have that, I mean, citizenship, just like I ask Officer Frier when I have the second interview with him and he ask me to go take a picture -- I mean, he sent me out of the building to go take a picture, and I asked him, I said, does it mean you are going to change this card that I have in my hand. And he goes -- he told me that, I mean, no, you keep that card. He did not explain to me, I mean, this is -- what was -- I mean, what is going on or nothing.

Q. Now, Mr. Olaogun, you said you have been to college, you're a manager, and you -- you didn't think that there was any difference between being a lawful permanent resident and being a U.S. citizen?

A. I would think it would be the same thing.

Q.   So you thought it was the same exact thing?

A.   Yeah, I think it's the same thing.  I mean, I'm working and I -- I don't know.  I mean, I don't know what the difference would be until you -- I mean, I got this problem now, but me working, which would be part of what a citizen should do.

Q.   Let me ask you this, when you completed the application and registration form for -- for voting -- before I get to that, what you just said is you didn't think there was a difference between being a U.S. citizen and being a lawful permanent resident, right?

A.   That's right.  I thought -- I thought it was still the same.

Q.   But if you recall on the I-9 form there was a -- you could have checked U.S. citizen or a lawful permanent resident, right?

A.   Yes, ma'am, but on that form it asked me -- it asked for a number on that one, and I know I have that number.  So, I mean, like the one for the -- for the voter's card -- voter's registration that I fill out, there was no option on that one, other than are you a citizen, but on the other -- the one that I filled for the I-9, it asked for that.  And then on the second line it asked for a number, so that's when I filled out the number.

Q. Let's look again at the I-9 form. You checked lawful permanent resident, right?

A. Yes, ma'am, because it asked for a number at the end of that one.

Q. And on the registration form can you see box number 1?

A. Yes, ma'am.

Q. And you agree that box number 1 says, are you a U.S. citizen?

A. Yes, ma'am.

Q. And you checked yes.

A. Yes, ma'am.

Q. And then if you go on to read below that question, the second part of the question is, if no, you cannot register to vote.

A. Yes, ma'am.

Q. And you still submitted this form, right?

A. Yes, ma'am.

Q. So you knew that if you're not a U.S. citizen, you could not register to vote?

A. At the present -- at that present -- at that time I thought I was a citizen, and that was the closest answer to that question on that form that I filled.

Q. And, again, in box number 1, are you a U.S. citizen, you checked yes, right?

A.   Yes, ma'am, because that's the same -- that's the same form.

Q.   Yes, it's the same form.  And you checked the same answer, yes, right?

A.   Yes, ma'am.

Q.   And then also at the bottom of the form, see right there, it says, I am a U.S. citizen, doesn't it?

A.   Yes, ma'am.

Q.   And you signed it, correct?

A.   Yes, ma'am.

Q.   Now, after you applied for U.S. citizenship in 1989, you did receive a notice indicating to you that your application had been denied, right?

A.   Yes, ma'am.

Q.   And let me just show you that notice.  Now, at the -- at the bottom of the notice it informs you that you may wish to submit a new application after you have obtained the required documents and have established that you can fully meet the requirements of the law.  Isn't it true that you did not file another application until 2005?

A.   No, I did not file another one until 2005.

Q.   So between 1990, when you received this notice, up until now in 2005, you had no reason to believe that you were a U.S. citizen, right?

A.   I did believe that I was because, I mean, what we usually talk about is what generality -- I mean, after you've been in the country five years, you -- you are automatically called a citizen.  And they made me aware of that -- after I talked to the Immigration office was that being here five years doesn't mean you automatically become one.  You still have to go through the process.

Q.   So, basically, what you are saying is you just thought that you would magically appear and you -- you would just magically become a U.S. citizen after just being here in the country for five years?

A.   Ultimately, yes, ma'am.

Q.   Isn't it true you did not receive anything from Immigration indicating that you had been granted U.S. citizenship status?

A.   No, because it said it was denied.

Q.   Okay.  So the only -- the only information that you had received from Immigration, the agency in charge of granting you U.S. citizenship, was that you had been denied U.S. citizenship, isn't that so?

A.   She told me -- at the second interview, that's what she did, I mean, she told me to come back, I mean, she was going to send me a letter for a second interview, and that's when I met Officer Frier.

Q. Let me make sure you understand my question. Isn't it true that the only notice that you received regarding your application for citizenship was in 1990 when you received the notice indicating that your application had been denied, right?

A. Probably -- it probably would be -- I mean, I -- I mean according to the -- I did receive the notice, but I can't remember receiving that notice, but, I mean, according to the -- what do you call it, the certification, I must have received it, yes.

Q. If you had received something, you would remember that, surely, right?

A. Yes, I would, but I mean, it's been so long I can't remember that. But I remember what transpired when I went to Frier this time.

Q. Now, I think you testified in 2000 -- 2005, May 19, I believe it was, you went to the airport to try to take a trip to England?

A. Yes, ma'am.

Q. That wasn't the only trip that you took out of the country, was it?

A. No, ma'am. I went out of the country, me and my wife and myself went to Nigeria for my father's funeral in 2004.

Q. So when you traveled to Nigeria in February 2004,

you would have been required to show the same things that you would have been required to show in May -- on May 19th of 2005, isn't that true?

A.  No, ma'am.  No, ma'am.  I was not asked for anything going to Nigeria.

Q.  So what you are saying is when you tried to reenter the country, reenter the United States, you did not have to provide your green card and your Nigerian passport?

A.  Yes, I did.  When I came back from Nigeria, yes.

Q.  And at no time during that trip when you returned, at no time did anyone from the airport ask you for a U.S. passport?

A.  No, ma'am.

Q.  So you were basically allowed to -- you were allowed to do something in February 2004 that you weren't allowed to do in May of 2005?

A.  That would be correct.

Q.  And for some unknown reason they allowed an exception for you?

A.  I don't think it would be an exception because, I mean, I went to Nigeria in 2000 -- like you said, in February of 2004 when I went to my father's funeral and coming back into the country, I mean, I didn't have any problem coming back in the country.

Q. They just allowed you to just walk through?

A. They checked my passport and --

Q. And when they checked your -- your green card, didn't that indicate to you that you were not a U.S. citizen?

A. Because -- I mean, that goes with my passport. I mean, when I'm traveling, that is supposed to be with my passport. It's always with my passport, that's why I always keep it in my passport.

Q. And, again, this is not a U.S. passport, right?

A. No, ma'am, it's a Nigerian passport.

Q. And as a lawful permanent resident, you don't have a U.S. passport, is that correct?

A. No, ma'am, I don't have.

MS. NESMITH: Your Honor, may I have a moment?

THE COURT: Yes, ma'am.

BY MS. NESMITH:

Q. Just one last thing. I'm showing you Government's Exhibit No. 3-A, and I'm turning to the last page of the application. Isn't this your signature right here?

A. Yes, ma'am.

Q. And the date that you signed it is February 16th of 2005, isn't that true?

A.   That is when I filled the application -- I mean, I -- was this February 16th, 2005?  That might be the day.  I looked for that date on there.

Q.   That's the day that you completed the application, February 16th, 2005?

A.   No -- I mean, I -- I can't remember what date I completed the application, but I remember I sent the application off.  I don't know what day they received the application, what day I sent the application off.

Q.   But this is the date that you entered.  You entered this date, right?

A.   I mean, I would have, yes.  I mean, I guess -- I think I would have.

Q.   And you would have dated it on the date that you actually signed it and sent it in to Immigration, correct?

A.   No -- I mean, when I fill out application, I do something, I could put whatever I did, I do it or something, or I probably put the wrong date, I can't remember.  I can't remember when I filled that form out.  It appears -- I mean, I don't know when I send it to them, I mean, when it got to the Immigration office.

Q.   But you would agree that this is the date that you actually signed the application, February 16, 2005?

A.  Not actually, ma'am, because, I mean, if I -- even if I fill out the application, if I'm not -- I mean, I go through the application, whatever, I sign it again or something.  Doesn't actually mean that that was date that I --

MS. NESMITH:  Your Honor, may I approach the witness?

THE COURT:  Sure.

BY MS. NESMITH:

Q.  For the record, I'm showing you Government's Exhibit 3-A.  Take a look at this application and tell me if there is another signature -- if you signed this application with any other date other than February 16th, 2005.

A.  No, ma'am.  I don't see any other date on this.

Q.  Take your time.

A.  No.  That's it.  I don't see another date on this.

Q.  So, Mr. Olaogun, isn't it true that on May 19th, 2005 when you traveled to England, when you tried to travel to England, that you knew you were not a U.S. citizen because you signed this application for U.S. citizenship on February 16th of 2005?

A.  Like I said, I probably put the wrong date on there but, I mean, when I went to travel, I think I mailed that application in May, three days after I

came back from -- from Orlando.  That's when that application was mailed.  I probably was -- I mean, I don't know -- I mean, I probably made a mistake and filled -- I mean putting the date or something, or whatever on that application.  But, yeah, that is my signature.

Q.  And that's the only date that's indicated on this application with your signature, isn't that so?

A.  That is correct.  That's the one I signed, yeah.

MS. NESMITH:  Thank you.  I have nothing further.

REDIRECT EXAMINATION

BY MR. MURRELL:

Q.  Mr. Olaogun, have you still got that application form there with you?  This is Government's Exhibit No. 3-A, and she was just showing you that date. Let's see if I can do this right here.  Yeah, it looks like by your name it does, typed in it says 2-16-2005. Is that the date, though, you actually signed this?

A.  No, sir.  I mean, I can't remember that's the day I actually signed it.

Q.  You signed this form after you got left at the airport in London?

A.  Yes, sir -- Orlando.

Q.  Orlando, right.  You didn't get to London.  You

got stuck at the airport in Orlando?

A.   Yes, sir.

Q.   So it looks like you simply typed the date wrong?

A.   Probably.  I probably did.

Q.   If you look at the front of this form, there is some stuff you didn't have any control over, but it looks like they received this form on May 23rd, 2005. Do you see that stamp there?

A.   Yes, sir.

Q.   And, in fact, there is another stamp on it a little further down, May 23rd, 2005.  Is that about the time you signed it?

A.   Yes, that would probably about the same time I signed it, I sent it in.

Q.   Did you fill this form out and keep it for three months and then mail it in?

A.   No.  No, sir.  I downloaded it on the computer and I filled it out.

Q.   Would you have had any reason to -- to fill this form out three months before you ultimately turned it in?

A.   No, sir.

Q.   Because you had a -- this green card, this resident alien card, did that suggest to you that you were not a citizen?

A.   No, sir.

Q.   Did you think you could have that card and still be a citizen?

A.   I think so.

Q.   By the way --

          MR. MURRELL:  If I could borrow your book, Mr. Reynolds.

BY MR. MURRELL:

Q.   Here is a book I just borrowed from Mr. Reynolds. It says Immigration Law Handbook.  It looks like the book he's been studying.  Have you ever studied a book like this?

A.   No, sir.

Q.   One thing I wanted to ask you about, you said that -- that at least when you registered to vote, you were of the view that if you've been here five years, you were a citizen?

A.   Uh-huh.

Q.   But I want to draw your attention to one thing. Now, you came to the country in 1978, and in 1990 is when you first registered to vote -- or when you first filed that application for citizenship, that was your first application.  And, of course, that was 12 years after you had been here.  So it must have been obvious to you at that point in time that being here five

years didn't make you a citizen?

A. No, it wasn't obvious to me at that time. I wasn't sure of that.

Q. But when you filled that form out in 1978 -- or 1990, you had been here 12 years?

A. Yes, sir, I had been here, but I -- yes. I got my green card I think about -- I got it in 19 -- I want to say 1982.

Q. Pardon?

A. I think -- I mean, I got the card --

Q. No, I'm not talking about your resident -- your permanent residency, that was, like you said, in 1982?

A. I think so.

Q. Got here in the country in '78, 1982 you became a permanent resident, and then about, oh, eight years or so, maybe 1990, that was when you first applied for citizenship?

A. Yes.

Q. Okay. So even though you've been here 12 years, you didn't automatically qualify then for citizenship?

A. I didn't know that at the time.

Q. Well, you got a letter saying that they wouldn't accept your application?

A. Yeah. When I filed the application, yes.

Q. Were you thinking about all that back when 11 or

12 years later you checked that box and said you were a citizen?

A.   No, sir.

Q.   By the way, when you were handed that form in 19 -- I'm sorry, in 2002, and then you filled out that change of address -- I guess it was 2001, 2002, but when you filled out those application forms, is that something you spent a lot of time on?

A.   No, sir.

Q.   Somebody handed you the form and you filled it out?

A.   That's correct.

Q.   Do you know how carefully you read the whole card?

A.   No, sir.  I mean, I didn't think I really read the whole card.

Q.   Going back to 1990 when you first attempted to apply for citizenship, your testimony was that it wasn't entirely clear to you what the difference was between being a permanent resident and a citizen?

A.   No, sir.

Q.   But you did think it was the right thing to do?

A.   Yes, sir, I thought it was.

Q.   You -- at that point you were -- you were married, you had family?

A.   Yes, sir.

Q. And you thought it was the right thing to do to apply to be a citizen?

A. Yes, sir.

Q. Right thing for you?

MS. NESMITH: Objection, Your Honor, leading.

THE COURT: Sustained.

BY MR. MURRELL:

Q. Did you think it was the right thing for your family?

A. Yes, sir.

Q. The -- that trip to Nigeria that you took, you didn't have any trouble taking that trip?

A. No, sir.

Q. They didn't require any additional documentation besides what you had?

A. Yes, sir. That's all they required.

Q. And when you went to London, though, those same documents didn't get you out of the airport?

A. No, sir.

Q. And that was when you realized that you weren't a citizen?

A. That's correct, sir.

Q. When you filled out those boxes, you checked those boxes on those two cards, those voter registration

cards, did you have any idea it could lead to something like this?

A.   No, sir.

Q.   If you had known it would lead to something like this or could possibly lead to something like this, would you have ever checked those two boxes?

A.   No, sir.

Q.   Would you have ever registered to vote?

A.   No, sir.

          MR. MURRELL:   That's all the questions I have.

          THE COURT:   You may step down, sir.

                         *   *   *

**I N D E X**

DEFENSE WITNESSES:                                                    Page

    Kolawole Abayomi Olaogun

        Direct Examination by MR. MURRELL ............    2

        Cross-Examination by Ms. Nesmith ..............   19

        Redirect Examination by  Mr. Murrell ..........   39

**EXHIBITS RECEIVED**:

        Defense Exhibit 2 ............................   19

C E R T I F I C A T E

STATE OF FLORIDA        )

COUNTY OF ESCAMBIA      )

I, W. PAUL RAYBORN, RPR, United States Court Reporter in Pensacola, Florida, do hereby certify as follows:

THAT I correctly reported in computer-aided machine shorthand the foregoing excerpt of proceedings at the time and place stated in the caption thereof;

THAT I later reduced my computer-aided shorthand notes to computer-aided transcription, or under my supervision, and that the foregoing pages numbered 1 through 46, both inclusive, contain a full, true and correct transcript of the excerpt of proceedings on said occasion;

THAT any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted with asterisks within the transcript;

THAT I am neither of kin nor of counsel to any party involved in this matter, nor in any manner interested in the results thereof.

DATED THIS  28th   DAY OF   March   , 2007.


s/  W. Paul Rayborn
W. PAUL RAYBORN, RPR
United States Court Reporter